**BEALL & BURKHARDT**
WILLIAM C. BEALL, STATE BAR NO. 97100
ERIC W. BURKHARDT, STATE BAR NO. 132812
1114 STATE STREET
LA ARCADA BUILDING, SUITE 200
SANTA BARBARA, CALIFORNIA, 93101
(805) 966-6774, FAX (805) 963-5988

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bk. No. 9:08-bk-13277-RR |
| | ) |
| Map Link, Inc., | ) In a Case Under Chapter 11 |
| | ) of the Bankruptcy Code |
| Debtor. | ) (11 U.S.C. §1101 et. seq.) |
| | ) |

**DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN AS MODIFIED**

**Disclosure Statement Hearing**

Date:  April 14, 2010
Time:  11:00 a.m.
Place: 1415 State Street
       Courtroom 201
       Santa Barbara, CA 93101

**Plan Confirmation Hearing**

Date:  July 14, 2010
Time:  11:00 a.m.
Place: 1415 State Street
       Courtroom 201
       Santa Barbara, CA 93101

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1
      A.  Purpose of this Document ............................................................ 1
      B.  Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ................... 2
          1.  Time and Place of the Confirmation Hearing ........................... 2
          2.  Deadline for Voting For or Against the Plan ............................ 3
          3.  Deadline for Objecting to the Confirmation of the Plan ........... 3
          4.  Identity of Person to Contact for More Information Regarding the Plan ............ 3
      C.  Disclaimer .................................................................................... 3

II.   BACKGROUND ....................................................................................... 3
      A.  Description and History of the Debtor's Business ......................... 3
      B.  Principals/Affiliates of Debtor's Business .................................... 5
      C.  Management of the Debtor Before and After the Bankruptcy ......... 5
      D.  Events Leading to Chapter 11 Filing............................................ 5
      E.  Significant Events......................................................................... 6
          1.  Bankruptcy Proceedings......................................................... 6
          2.  Other Legal Proceedings ........................................................ 7
          3.  Actual and Projected Recovery of
              Preferential or Fraudulent Transfers...................................... 7
          4.  Procedures Implemented to Resolve Financial Problems ......... 7
          5.  Current and Historical Financial Conditions........................... 9

III.  SUMMARY OF THE PLAN OF REORGANIZATION ........................... 10
      A.  What Creditors and Interest Holders Will Receive Under the Proposed Plan ................ 10
      B.  Unclassified Claims....................................................................... 11
          1.  Administrative Expenses......................................................... 11
          2.  Priority Tax Claims................................................................ 12
      C.  Classified Claims and Interests ..................................................... 13
          1.  Classes of Secured Claims ...................................................... 13
          2.  Classes of Priority Unsecured Claims ..................................... 14
          3.  Classes of General Unsecured Claims...................................... 14
          4.  Class(es) of Interest Holders .................................................. 15
      D.  Means of Effectuating the Plan ..................................................... 16
          1.  Funding for the Plan.............................................................. 16

2.   Post-Confirmation Management ............................................................. 16
3.   Disbursing Agent ............................................................................... 16
E.   Risk Factors ............................................................................................ 16
F.   Other Provisions of the Plan .................................................................... 16
1.   Executory Contracts and Unexpired Leases ...................................... 16
a)   Assumptions ............................................................................. 16
b)   Rejections ................................................................................. 17
2.   Changes in Rates Subject to Regulatory Approval ............................ 17
3.   Retention of Jurisdiction .................................................................. 17
G.   Tax Consequences of Plan ....................................................................... 17

IV.   CONFIRMATION REQUIREMENTS AND PROCEDURES ........................... 18
A.   Who May Vote or Object .......................................................................... 18
1.   Who May Object to Confirmation of the Plan ................................... 18
2.   Who May Vote to Accept/Reject the Plan ......................................... 18
a)   What is an Allowed Claim/Interest .......................................... 19
b)   What is an Impaired Claim/Interest .......................................... 19
3.   Who is Not Entitled to Vote ............................................................. 20
4.   Who Can Vote in More Than One Class ............................................ 21
5.   Votes Necessary to Confirm the Plan ............................................... 21
6.   Votes Necessary for a Class to Accept the Plan ................................ 21
7.   Treatment of Nonaccepting Classes .................................................. 21
8.   Request for Confirmation Despite Nonacceptance by Impaired Class(es) ............ 22
B.   Liquidation Analysis ................................................................................ 22
C.   Feasibility ................................................................................................ 24

V.   EFFECTS OF CONFIRMATION OF PLAN ..................................................... 27
A.   Discharge ................................................................................................. 28
B.   Revesting of Property in the Debtor ......................................................... 28
C.   Modification of Plan ................................................................................ 28
D.   Post-Confirmation Status Report .............................................................. 28
E.   Post-Confirmation Conversion/Dismissal ................................................. 28
F.   Final Decree ............................................................................................ 29

VI.   SUPPORTING DECLARATIONS ..................................................................
EXHIBIT A – Unexpired Leases to be Assumed ................................................... 30
EXHIBIT B – Financial Statement ....................................................................... 31

## I

## INTRODUCTION

Map Link is the Debtor in a Chapter 11 bankruptcy case.   On December 11, 2008, Map Link commenced a bankruptcy case by filing its Chapter 11 petition under the United States Bankruptcy Code ("Code"), 11 U.S.C. §101 et. seq.   Chapter 11 allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization ("Plan").   The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.   Map Link is the party proposing the Plan sent to you in the same envelope as this document.   THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

**A.**   **Purpose of This Document**.

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW:**

(1)   **Who can vote or object,**

(2)   **What the treatment of your claim is** (i.e., what your claim will receive if the plan is confirmed), **and how this treatment compares to what your claim would receive in liquidation,**

(3)   **The history of the debtor and significant events during the bankruptcy,**

(4)   **What things the court will look at to decide whether or not to confirm the plan,**

(5)   **What is the effect of confirmation, and**

(6)   **Whether this plan is feasible.**

1    This Disclosure Statement cannot tell you everything about

2  your rights.   You should consider consulting your own lawyer to

3  obtain more specific advice on how this Plan will affect you and

4  what is the best course of action for you.

5    Be sure to read the Plan as well as the Disclosure Statement.

6  If there are any inconsistencies between the Plan and the

7  Disclosure Statement, the Plan provisions will govern.

8    The Code requires a Disclosure Statement to contain "adequate

9  information" concerning the Plan.   The Bankruptcy Court ("Court")

10  has approved this document to enable parties affected by the Plan

11  to make an informed judgment about the Plan.   Any party can now

12  solicit votes for or against the Plan.

13    **B.**   **Deadlines for Voting and Objecting; Date of Plan**

14  **Confirmation Hearing.**

15    THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

16  DISCLOSURE STATEMENT.   IN OTHER WORDS, THE TERMS OF THE PLAN ARE

17  NOT YET BINDING ON ANYONE.   HOWEVER, IF THE COURT LATER CONFIRMS

18  THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL

19  CREDITORS AND INTEREST HOLDERS IN THIS CASE.

20    **1.**   **Time and Place of the Confirmation Hearing.**

21    The hearing where the Court will determine whether or

22  not to confirm the Plan will take place on July 14, 2010, at 11:00

23  a.m., in the United States Bankruptcy Court, 1415 State Street,

24  Courtroom 201, Santa Barbara, California, 93101.

25    **2.**   **Deadline for Voting For or Against the Plan.**

26    If you are entitled to vote, it is in your best interest

27  to timely vote on the enclosed ballot and return the ballot in the

28

2

1  enclosed envelope to Beall & Burkhardt, 1114 State Street, Suite

2  200, Santa Barbara, California, 93101.

3        Your ballot must be received by July 1, 2010, or it will

4  not be counted.

5        **3.    Deadline for Objecting to the Confirmation of the**

6        **Plan.**

7        Objections to the confirmation of the Plan must be filed

8  with the Court and served upon Beall & Burkhardt, counsel for the

9  Debtor, by July 1, 2010.

10       **4.    Identity of Person to Contact for More Information**

11       **Regarding the Plan.**

12       Any interested party desiring further information about

13  the Plan should contact Eric W. Burkhardt or Bill Hunt.

14     C.   **Disclaimer.**

15       The financial data relied upon in formulating the Plan is

16  based on Map Link's historical and projected budgets.   The

17  information contained in this Disclosure Statement is provided by

18  Map Link.   The Plan Proponent represents that everything stated in

19  the Disclosure Statement is true to the Proponent's best

20  knowledge.   The Court has not yet determined whether or not the

21  Plan is confirmable and makes no recommendation as to whether or

22  not you should support or oppose the Plan.

23                            II

24                        **BACKGROUND**

25     A.   **Description and History of the Debtor's Business.**

26       Map Link, America's leading distributor of maps, atlases and

27  geographical information, began in 1984 as Pacific Travellers

28  Supply.   Founders Bill Hunt and Laura Ericson opened a retail shop

1  at 529 State St, Santa Barbara, on 10 March 1984.  The shop grew

2  and the business diversified into wholesale distribution of maps

3  and atlases.    During the 1980s, the business expanded as it

4  gathered many Asian, Australian and European map series for

5  distribution to retailers in the United States and Canada.

6  Map Link was established as a California corporation on 2

7  June 1989.  Pacific Travellers Supply remained the name for the

8  retail store in Santa Barbara and Map Link was used as the name

9  for the wholesale and distribution business.

10  In 1992 Map Link added a large customer, Barnes and Noble.

11  The Barnes and Noble sales expanded rapidly to become about 80% of

12  the total business.  During the next decade and a half, the Barnes

13  and Noble sales grew by four times, peaking at about $11 million

14  annually in 2006 and 2007.

15  Map Link moved to its current location in November, 1996.

16  The current facility encompasses 31,000 square feet in Goleta at

17  30 S La Patera Lane.  The warehouse holds rows of maps and atlases

18  for packing into orders, several shipping stations and a large

19  area of pallet racks for overstock and bulky storage.

20  Sales crashed precipitously in 2008 as the Great Recession

21  appeared.  Barnes and Noble did not renew their contract with Map

22  Link in late 2008.  Sales fell from about **$14 million in 2006 to**

23  **approximately $2.5 million in 2009**.  Although the Barnes and Noble

24  business was lost, nearly all remaining customers stayed with Map

25  Link.  During 2009 the business stabilized and Map Link continued

26  distribution to bookstores, map and travel specialty stores as

27  well as a variety of customers around the world.

28

4

**B.   Principals/Affiliates of Debtor's Business**.

Bill Hunt, one of the founders, owns 94% of the shares of Map Link.  Henry Poirot, living in Boulder, Colorado, holds the remaining shares.  Bill Hunt is the sole principal managing the business on a day-to-day basis.

Map Link owns a 50% interest in Benchmark Maps LLC, a publishing company based in Medford, Oregon.  Benchmark produces state road atlases of the eleven Western states and has published some folded road maps extracted from the body of cartography prepared for the atlas series.  These folded maps consist of state and regional recreation maps.  About 90% of the sales come from the state atlas series.

**C.   Management of the Debtor Before and After the Bankruptcy**.

Bill Hunt, majority shareholder and founder, has managed Map Link since inception.  He will continue to manage Map Link after its emergence from the bankruptcy.

**D.   Events Leading to Chapter 11 Filing**.

Here is a brief summary of the circumstances that **led to the filing** of this Chapter 11 case:

Several factors combined to lead Map Link to file for Chapter 11 bankruptcy protection.  First, there have been structural market changes causing consumers to buy fewer paper maps and atlases.  New technology has permitted the consumer and professional to use computers, GPS devices and cell phones for directions.  The market shrunk considerably, starting about 2005 and 2006.

Second, the Great Recession of 2008-2009 reduced sales dramatically.  Economic conditions reduced travel and

5

discretionary spending.  Barnes and Noble sold 25% fewer maps through their stores in 2008 than the year before.

Third, Barnes and Noble ("BN") chose to end their 16-year distribution agreement with Map Link.  Their sales fell so far so fast that BN decided to reduce the space for maps in the store and return inventory.  They returned nearly $2 million of maps to Map Link.  Since BN sales fell by 50% from the previous year, Map Link had large monthly losses.

Map Link tried to reduce expenses as fast as possible but it was unable to make up for the dollars lost in declining sales and returned product. This combination led to the filing of this reorganization bankruptcy.

E.    **Significant Events During the Bankruptcy**.

1.    **Bankruptcy Proceedings**.

The following is a chronological list of significant events which have occurred **during** this case:

11 Dec 2008:  Map Link filed a Voluntary Petition for Chapter 11 bankruptcy protection.

8 Mar 2009:  Map Link's landlord, La Patera Investors, agreed voluntarily to reduce monthly lease payments from $38,154 per month to $15,000 per month effective 1 Apr 2009.  Map Link assumed the lease, which expires 30 Nov 2010.

18 Mar 2009:  Map Link and Barnes and Noble reached an agreement concerning amounts owed under its distribution agreement, which terminated 31 Jan 2009.  The total settlement was approximately $471,000.

19 Mar 2009:  Map Link wrote off $132,334 of obsolete USGS topo inventory after gaining the approval of secured creditor, Rabobank.

**2.    Other Legal Proceedings.**

In addition to the proceedings discussed above, the Debtor is currently involved in the following non-bankruptcy legal proceedings:

1 Oct 2009:    The Debtor's principal, Bill Hunt, filed for Chapter 7 personal bankruptcy after Map Link's only secured creditor, Rabobank, filed suit to enforce Mr. Hunt's personal loan guarantee. Map Link had been and continues to make timely regular interest payments and has paid Rabobank a principal pay down of over $370,000 since the petition was filed in December 2008 (through April 2010). At the time of filing, Rabobank was owed a total of approximately $1,385,000 for 4 separate loans. The three smaller loans have been paid in full and current balance on the remaining loan is approximately $1,015,000.

There are no other legal proceedings pending that involve Map Link.

**3.    Actual and Projected Recovery of Preferential or Fraudulent Transfers.**

There are no such transfers that the Debtor believes can or should be pursued.

**4.    Procedures Implemented to Resolve Financial Problems.**

To attempt to fix the problems that led to the bankruptcy filing, the Debtor has implemented the following procedures:

In order to remedy the financial problems that led to Map Link's Chapter 11 filing, Map Link has reduced expenses. Payroll at the end of 2007 was about $80,000 per two-week pay period. Today the payroll runs about $20,000 per pay period. The total

1  employee count was reduced from 65 to 14.   There are now just 11

2  full-time employees.

3      Other steps taken by the debtor to reduce expenses have also

4  made important contributions.   Map Link successfully renegotiated

5  the lease, reducing the monthly rent payments from $38,154 to

6  $15,000.   Telephone, web hosting and various other services were

7  also renegotiated at much lower monthly rates.

8      The map industry is suffering, as evidenced by recent changes

9  at America's three leading map publishers.   In 2008, industry

10  leader Rand McNally was sold to Patriarch Partners, a private

11  equity firm specializing in distressed businesses.   The second

12  leading map industry publisher, American Map has been for sale for

13  the last several months after years of declining sales and losses.

14  The third national map publisher, Universal Map, filed for Chapter

15  11 bankruptcy protection in 2007.   It was converted to Chapter 7

16  liquidation the next year.

17      Map Link is optimistic about its future prospects.   A

18  significant wholesaler, Treaty Oak, ceased distribution sales in

19  January, 2010, giving Map Link a bump in sales.   New sales

20  opportunities include a massive, limited-edition world atlas and a

21  new venture with 3-D postcards which will potentially double sales

22  in the current year.   Map Link continues to be committed to serve

23  its loyal customer base and maintain a steady distribution of maps

24  and atlases in the years ahead.

25      Map Link now has three managers running the business on

26  a day-to-day basis.   Duane Rosendahl oversees the warehouse and

27  inventory.   Marcia Green takes care of administrative and customer

28  service functions.   Bill Hunt manages the business with an

emphasis in gathering new business, vendor relations and takes

care of bankruptcy requirements.

      **5.    Current and Historical Financial Conditions.**

    The following chart shows Map Link's 2009 cash flow:

**Map Link 2009 Cash Flow**

| Month | Cash rec'd | Cash disbursed | Ending balance | Payroll | Rabobank |
|---|---|---|---|---|---|
| January | $356,382 | $373,136 | $78,214 | $82,379 | $44,144 |
| February | $190,173 | $211,818 | $56,569 | $62,000 | $21,450 |
| March | $474,588 | $301,635 | $229,522 | $53,000 | $21,096 |
| April | $319,509 | $453,801 | $95,229 | $80,000 | $139,973 |
| May | $151,918 | $214,876 | $32,302 | $54,000 | $15,110 |
| June | $186,256 | $166,587 | $51,971 | $51,500 | $15,000 |
| July | $195,516 | $225,578 | $21,909 | $50,500 | $29,256 |
| August | $220,870 | $201,655 | $41,124 | $44,000 | $19,743 |
| September | $277,808 | $181,454 | $137,479 | $40,500 | $19,672 |
| October | $181,640 | $221,071 | $98,048 | $67,693 | $19,456 |
| November | $131,672 | $129,989 | $99,730 | $45,000 | $19,500 |
| December | $194,874 | $217,968 | $76,635 | $43,000 | $19,341 |
| **TOTAL** | **$2,881,206** | **$2,899,568** | | **$673,572** | **$383,741** |

    Map Link's prospects for 2010 are good.  The company expects

higher sales as the economy improves, a competitor stopped selling

to Map Link customers, and new sales develop for the projects

currently underway.  Map Link's fixed expenses for payroll and

rent, which total about $50,000, can't be reduced.  Most remaining

expenses are variable, increasing as sales increase, such as cost

of good solds and shipping expenses.  Map Link expects to resume

profitability this summer, as maps and atlases are a seasonal

business, and sales will be strengthening each month for the next several months.

Future profits are the source of repayment for the Plan. These profits are anticipated from two new ventures. One is a limited-edition collectible world atlas called EARTH that sells at $5800 per copy. The other source is the distribution of sharp 3-D postcards, magnets, rulers and bookmarks with images of planets and animals. Both projects are off to a good start and will contribute a significant part to Map Link's profitability.

The following table provides the current fair market value of Map Link's assets. These assets are valued as of the dates indicated.

**Map Link Fair Market Value**

| Assets | Fair Market Value | Valuation Date |
|---|---|---|
| Cash | $76,635 | 1-Jan-10 |
| Autos, fixtures and equipment | $38,741 | 1-Jan-10 |
| Inventory | $745,640 | 18-Jan-10 |
| SUBTOTAL | $861,016 | |
| | | |
| Accounts receivable | $389,674 | 1-Jan-10 |
| 50% share of Benchmark Maps LLC | $358,000 | 31-Oct-08 |
| TOTAL | $1,608,690 | |

**III**

**SUMMARY OF THE PLAN OF REORGANIZATION**

**A.   What Creditors and Interest Holders Will Receive Under the Proposed Plan.**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

10

B.    **Unclassified Claims**.

Certain types of claims are not placed into voting classes; instead they are unclassified.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Proponent has **not** placed the following claims in a class.

1.    **Administrative Expenses**.

Administrative expenses are claims for costs or expenses of administering the Debtors' Chapter 11 case which are allowed under Code §507(a)(1).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists **all** of the Debtors' §507(a)(1) administrative claims and their treatment under this Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| Beall & Burkhardt | $45,000 (est) | Paid in full on Effective Date Date or per the terms of an agreement to be entered into between the Debtor and claimant. |
| McGowan Guntermann | $5,000 (est) | Paid in full on Effective Date Date or per the terms of an agreement to be entered into between the Debtor and claimant. |
| Clerk's Office Fees | minimal | Paid in full on Effective Date |
| Office of the U.S. Trustee Fees | None currently owing | Paid in full on Effective Date |
| Accounts Payables Vendors | Fluctuates | To be Paid in the Ordinary Course of Business |
| **TOTAL** | | |

Court Approval of Fees Required:

The court must rule on all fees listed in this chart before the fees will be owed.  For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court

11

1   must rule on the application.  Only the amount of fees allowed by

2   the Court will be owed and required to be paid under this Plan.

3          As indicated above, the Debtor will need to pay

4   approximately $50,000 worth of administrative claims on the

5   Effective Date of the Plan unless the claimant has agreed to be

6   paid later or the Court has not yet ruled on the claim.   As

7   indicated elsewhere in this Disclosure Statement, Debtor will have

8   $72,808 of cash on hand on the anticipated Effective Date of the

9   Plan in July 2010 or later.  The source of this cash will be from

10  ongoing operations.

11          **2.    Priority Tax Claims.**

12          Priority tax claims are certain unsecured income,

13  employment and other taxes described by Code §507(a)(8). The Code

14  requires that each holder of such a §507(a)(8) priority tax claim

15  receive the present value of such claim in deferred cash payments,

16  over a period not exceeding six years from the date of the

17  assessment of such tax.  The Debtor does not believe any priority

18  tax claims exist in this case.

19     **C.   Classified Claims and Interests.**

20          **1.    Classes of Secured Claims.**

21          Secured claims are claims secured by liens on property

22  of the estate.  The following chart lists all classes containing

23  Debtor's secured pre-petition claims and their treatment under

24  this Plan.

25

26

27

28

| Class # | Description | | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|---|
| 1 | Secured Claim of: | Rabobank | NO | YES | Initial Payment amount/ interval: $15,000 principal per month through July 2012 plus monthly interest at the note non-default rate |
| | Collateral description | Inventory, Accounts Receivables, bank accounts | | | Increased Payment amount/interval: $25,000 principal per month from August 2012 through June 2013 plus monthly interest at the note non-default rate |
| | Collateral value: | $1,250,690 | | | Balloon Payment: $350,000 on or before June 30, 2013 |
| | Priority of security int.: | 1st | | | Begin Date: Payments of $15,000 per month principal have been made from case inception plus an additional principal pay down of $120,000 for a total principal reduction of $370,000 through April 2010 |
| | Interest rate: | Non-Default Note Rate | | | End date: June 2013 |
| | Principal owed: | $1,015,000 | | | Total payout: 100% |
| | Pre-petition arrearage amt: | None currently owed above principal | | | Treatment of Lien: Rabobank shall receive a replacement lien on all Inventory, Accounts Receivables, bank accounts |
| | Post-pet. arrearage amt: | None currently owed above principal | | | Other terms: Map Link has agreed not to sell or encumber its interest in Benchmark Maps, LLC, without Rabobank's consent or payment in full; Rabobank shall not receive any pre or post-petition default interest, late charges or legal fees; If Map Link's quarterly income exceeds its budget projections by more than 10%, 50% of the excess amount above 10% shall be paid to Rabobank toward principal (reducing the final balloon payment amount) unless Map Link's income in any of the prior three quarters was more than 10% below projections, in which case the 10% trigger shall be increased by such prior shortfall; Map Link shall provide Rabobank with quarterly financial reports |
| | Total claim amount: | $1,015,000 | | | |

2.    **Class of Priority Unsecured Claims.**

Certain priority claims that are referred to in Code §507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

The following chart lists all classes containing Debtor's §507(a)(3), (4), (5), (6), and (7) priority unsecured claims and their treatment under this Plan.

| Class # | Description | Impaired (Y/N) | Treatment |
|---------|-------------|----------------|-----------|
| 2 | Priority unsecured claim pursuant to Section 507(a)(4) vacation claims<br><br>Total amount of claims:    $45,000 | Yes | Paid in 4 equal quarterly installments beginning September 2011 and ending June 2012 |

3.    **Class of General Unsecured Claims.**

General unsecured claims are unsecured claims not entitled to priority under Code §507(a). The following chart identifies this Plan's treatment of the class containing **all** of Debtor's general unsecured claims.

14

| Class # | Description | Impaired (Y/N) | Treatment | |
|---------|-------------|----------------|-----------|---|
| 3 | General unsecured claims<br><br>Total amount of claims Approximately $1,900,000 | YES | Payment interval: | Semi-Annually beginning September 2010 |
| | | | Payment amount/interval: | The following payments shall be distributed on a pro-rata basis to all unsecured creditors:<br>Sep 2010 - $10,000<br>Mar 2011 - $20,000<br>Sep 2011 - $40,000<br>Mar 2012 - $40,000<br>Sep 2012 - $50,000<br>Mar 2013 - $50,000<br>Sep 2013 - $60,000<br>Mar 2014 - $60,000<br>Sep 2014 - $50,000<br>(or the amount necessary to result in a total 20% payout) |
| | | | Begin date: | September 2010 |
| | | | End date: | September 2014 |
| | | | Interest rate: | None |
| | | | Total payout 20%: | Approximately $380,000 |

## 4.   Class(es) of Interest Holders.

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor.   If the Debtor is a corporation, entities holding preferred or common  stock in the Debtor are interest holders.  If the Debtor is a partnership, the interest holders include both general and limited partners.   If the Debtor is an individual, the Debtor is the interest holder. The following chart identifies this Plan's treatment of the class of interest holders.

| Class # | Description | Impaired (Y/N) | Treatment |
|---------|-------------|----------------|-----------|
| 4 | Interest holders | NO | Retain their stock subject to the plan obligations |

**D.    Means of Performing the Plan.**

**1.    Funding for the Plan.**

The Plan will be funded by the following: Regular business operations and, if necessary to fund the June 2013 balloon payment to Rabobank, a new loan secured by the inventory, accounts and accounts receivables.

**2.    Post-Confirmation Management.**

Post confirmation management will remain the same as pre confirmation management.

**3.    Disbursing Agent.**

Bill Hunt, the Debtor's president, shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan.   The Disbursing Agent shall serve without bond and shall receive no compensation for distribution services rendered and expenses incurred pursuant to the Plan.

**E.    Risk Factors.**

The proposed Plan has the following risks:

The primary risk is that the Debtor may not be able to meet its income projections or that it may incur unforeseeable expenses.

**F.    Other Provisions of the Plan.**

**1.    Executory Contracts and Unexpired Leases.**

**a)    Assumptions.**

The following are the unexpired leases and executory contracts to be assumed as obligations of the reorganized Debtor under this Plan (see Exhibit A for more detailed information on unexpired leases to be assumed): The lease for the Debtor's warehouse and office space which runs through November 30, 2010.

16

1    On the Effective Date, each of the unexpired leases and

2    executory contracts listed above shall be assumed as obligations

3    of the reorganized Debtor.   The Order of the Court confirming the

4    Plan shall constitute an Order approving the assumption of each

5    lease and contract listed above.   If you are a party to a lease or

6    contract to be assumed and you object to the assumption of your

7    lease or contract, you must file and serve your objection to the

8    Plan within the deadline for objecting to the confirmation of the

9    Plan.   See Section {I.B.3.} of this document for the specific

10    date.

11              **b)    Rejections.**

12    On the Effective Date, the following executory contracts and

13    unexpired leases will be rejected:

14    The Debtor does not believe it has any such contracts or

15    leases to be rejected.

16    **2.    Changes in Rates Subject to Regulatory Commission.**

17    This Debtor is not subject to governmental regulatory

18    commission approval of its rates.

19              **3.    Retention of Jurisdiction.**

20    The Court will retain jurisdiction to the extent provided by

21    law.

22    **G.    Tax Consequences of Plan.**

23    *Creditors and interest holders concerned with how the plan*

24    *may affect their tax liability should consult with their own*

25    *accountants, attorneys, and/or advisors.*   The following disclosure

26    of possible tax consequences is intended solely for the purpose of

27    alerting readers about possible tax issues this Plan may present

28    to the Debtor.   The Proponent **cannot** and **does not** represent that

17

1  the tax consequences contained below are the only tax consequences

2  of the Plan because the Tax Code embodies many complicated rules

3  which make it difficult to state completely and accurately all the

4  tax implications of any action.

5                                    IV

6                 **CONFIRMATION REQUIREMENTS AND PROCEDURES**

7      *Persons or entities concerned with confirmation of this Plan*

8  *should consult with their own attorneys because the law on*

9  *confirming a Plan of Reorganization is very complex.*    The

10  following discussion is intended solely for the purpose of

11  alerting readers about basic confirmation issues, which they may

12  wish to consider, as well as certain deadlines for filing claims.

13  The Proponent **cannot** and **does not** represent that the discussion

14  contained below is a complete summary of the law on this topic.

15      Many requirements must be met before the Court can confirm a

16  Plan. Some of the requirements include that the Plan must be

17  proposed in good faith, acceptance of the Plan, whether the Plan

18  pays creditors at least as much as creditors would receive in a

19  Chapter 7 liquidation, and whether the Plan is feasible.    These

20  requirements are **not** the only requirements for confirmation.

21      **A.    Who May Vote or Object.**

22          **1.    Who May Object to Confirmation of the Plan.**

23      Any party in interest may object to the confirmation of the

24  Plan, but as explained below not everyone is entitled to vote to

25  accept or reject the Plan.

26          **2.    Who May Vote to Accept/Reject the Plan.**

27      A creditor or interest holder has a right to vote for or

28  against the Plan if that creditor or interest holder has a claim

1  which is both (1) allowed or allowed for voting purposes, and (2)

2  classified in an impaired class.

3  **a)   What Is an Allowed Claim/Interest.**

4  As noted above, a creditor or interest holder must first have

5  an **allowed claim or interest** to have the right to vote.

6  Generally, any proof of claim or interest will be allowed, unless

7  a party in interest brings a motion objecting to the claim.   When

8  an objection to a claim or interest is filed, the creditor or

9  interest holder holding the claim or interest cannot vote unless

10  the Court, after notice and hearing, either overrules the

11  objection or allows the claim or interest for voting purposes.

12  *The bar date for filing a Proof of Claim in this case was*

13  *March 1, 2010.*   A creditor or interest holder may have an allowed

14  claim or interest even if a proof of claim or interest was not

15  timely filed.   A claim is deemed allowed if (1) it is scheduled on

16  the Debtor's schedules and such claim is not scheduled as

17  disputed, contingent, or unliquidated, and (2) no party in

18  interest has objected to the claim.   An interest is deemed allowed

19  if it is scheduled and no party in interest has objected to the

20  interest.

21  **b)   What Is an Impaired Claim/Interest.**

22  As noted above, an allowed claim or interest only has the

23  right to vote if it is in a class that is **impaired** under the Plan.

24  A class is impaired if the Plan alters the legal, equitable, or

25  contractual rights of the members of that class.   For example, a

26  class comprised of general unsecured claims is impaired if the

27  Plan fails to pay the members of that class 100% of what they are

28  owed.

1    In this case, the Proponent believes that Classes 1, 2 and 3

2  are impaired and that holders of claims in each of these classes

3  are therefore entitled to vote to accept or reject the Plan.    The

4  Proponent believes that Class 4 is unimpaired and that holders of

5  claims in this class therefore do not have the right to vote to

6  accept or reject the Plan. Class 4 is deemed to accept the Plan.

7  Parties who dispute the Proponent's characterization of their

8  claim or interest as being impaired or unimpaired may file an

9  objection to the Plan contending tha the Proponent has incorrectly

10  characterized the class.

11      **3.    Who is <u>Not</u> Entitled to Vote.**

12      The following four types of claims are **not** entitled to

13  vote:

14      (1)   Claims that have been disallowed;

15      (2)   Claims in unimpaired classes;

16      (3)   Claims entitled to priority pursuant to Code

17      §§507(a)(1), (a)(2), and (a)(8); and

18      (4)   Claims in classes that do not receive or

19      retain any value under the Plan.

20  Claims in unimpaired classes are not entitled to vote because

21  such classes are deemed to have accepted the Plan.    Claims

22  entitled to priority pursuant to Code §§507(a)(1), (a)(2), and

23  (a)(8) are not entitled to vote because such claims are not placed

24  in classes and they are required to receive certain treatment

25  specified by the Code.    Claims in classes that do not receive or

26  retain any value under the Plan do not vote because such classes

27  are deemed to have rejected the Plan.    ***Even if your claim is of***

28

1  *the type described above, you may still have a right to object to*

2  *the confirmation of the Plan.*

3  **4.   Who Can Vote in More Than One Class.**

4  A creditor whose claim has been allowed in part as a secured

5  claim and in part as an unsecured claim is entitled to accept or

6  reject a Plan in both capacities by casting one ballot for the

7  secured part of the claim and another ballot for the unsecured

8  claim.

9  **5.   Votes Necessary to Confirm the Plan.**

10  If impaired classes exist, the Court cannot confirm the Plan

11  unless:

12  (1)  At least one impaired class has accepted the Plan

13  without counting the votes of any insiders with that class; and

14  (2)  All impaired classes have voted to accept the Plan,

15  unless the Plan is eligible to be confirmed by "cramdown" on non-

16  accepting classes, as discussed later in Section {IV.A.8}.

17  **6.   Votes Necessary for a Class to Accept the Plan.**

18  A class of claims is considered to have accepted the Plan

19  when more than one-half (1/2) in number and at least two-thirds

20  (2/3) in dollar amount of the claims which actually voted, voted

21  in favor of the Plan.  A class of interests is considered to have

22  accepted the Plan when at least two-thirds (2/3) in amount of the

23  interest holders of such class which actually voted, voted to

24  accept the Plan.

25  **7.   Treatment of Nonaccepting Classes.**

26  As noted above, even if **all** impaired classes do not accept

27  the proposed Plan, the Court may nonetheless confirm the Plan if

28  the nonaccepting classes are treated in the manner required by the

1   Code.   The process by which nonaccepting classes are forced to be

2   bound by the terms of the Plan is commonly referred to as

3   "cramdown".   The Code allows the Plan to be "crammed down" on

4   nonaccepting classes of claims or interest if it meets all

5   consensual requirements except the voting requirements of

6   §1129(a)(8) and if the Plan does not "discriminate unfairly" and

7   is "fair and equitable" toward each impaired class that has not

8   voted to accept the Plan as referred to in 11 U.S.C. §1129)b) and

9   applicable case law.

10          **8.   Request for Confirmation Despite Nonacceptance by**

11   **Impaired Class(es).**

12       The party proposing this Plan, Map Link, asks **the Court** to

13   confirm this Plan by cramdown on impaired classes 1 and 2 if

14   either of these classes do not vote to accept the Plan.

15       Please note that the proposed Plan treatment described by

16   this Disclosure Statement **cannot** be crammed down on the following

17   classes:   3.   **As a result, if this class does _not_ vote to accept**

18   **the Plan, the Plan will _not_ be confirmed.**

19       B.   **Liquidation Analysis.**

20       Another confirmation requirement is the "Best Interest Test",

21   which requires a liquidation analysis.   Under the Best Interest

22   Test, if a claimant or interest holder is in an impaired class and

23   that claimant or interest holder does not vote to accept the Plan,

24   then that claimant or interest holder must receive or retain under

25   the Plan property of a value not less than the amount that such

26   holder would receive or retain if the Debtor were liquidated under

27   Chapter 7 of the Bankruptcy Code.

28

1    In a Chapter 7 case, the Debtor's assets are usually sold by

2    a Chapter 7 trustee.   Secured creditors are paid first from the

3    sales proceeds of properties on which the secured creditor has a

4    lien.   Administrative claims are paid next.   Then, unsecured

5    creditors are paid from any remaining sales proceeds, according to

6    their rights to priority.   Unsecured creditors with the same

7    priority share in proportion to the amount of their allowed claim

8    in relationship to the amount of total allowed unsecured claims.

9    Finally, interest holders receive the balance that remains after

10   all creditors are paid, if any.

11   For the Court to be able to confirm the Plan, the Court must

12   find that all creditors and interest holders who do not accept the

13   Plan will receive at least as much under the Plan as such holders

14   would receive under a Chapter 7 liquidation.   The Plan Proponent

15   maintains that this requirement is met here for the following

16   reasons:

17   All creditors and interest holders will receive at least as

18   much under the Plan as such creditor or interest holder would

19   receive under Chapter 7 liquidation.   The Table below, offers a

20   detailed explanation of how the following assets are valued.   This

21   information is provided by the debtor.

**Assets at Liquidation Value**

| Current assets | Value |
| --- | --- |
| Cash | $76,635 |
| Inventory | $74,564 |
| Accounts receivable | $97,418 |
| Total current assets | $248,617 |
| **Fixed assets** | |

23

| | |
|---|---|
| Automobiles | $8,000 |
| Other business equipment | $14,915 |
| 50% share of Benchmark Maps LLC | $286,400 |
| Total fixed assets | $309,315 |
| **TOTAL ASSETS AT LIQUIDATION VALUE** | **$557,932** |
| Less secured creditor's recovery | $271,532 |
| Less Chapter 11 administrative expenses | $50,000 |
| Less accounts payable and priority claims | $280,000 |
| Balance for unsecured claims | -$43,600 |
| Percent paid to unsecured claims in liquidation: | 0% |
| Percent paid to unsecured claims with this Plan: | 20% |

Below is a demonstration, in tabular format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or holder would receive under a Chapter 7 liquidation.

| Claims and Classes | Payout Percentage Under the Plan | Payout Percentage in Chapter 7 Liquidation |
|---|---|---|
| Administrative claims | 100% | 100% |
| Priority Tax Claims | N/A | N/A |
| Class 1: Rabobank (secured creditor) | 100% | 26% |
| Class 2: Priority | 100% | 84% |
| Class 3: Unsecured creditors | 20% | 0% |
| Class 4: Shareholder interest | 100% | 0% |

C.   **Feasibility**.

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not

24

1    likely to be followed by the liquidation, or the need for further

2    financial reorganization, of the Debtor or any successor to the

3    Debtor under the Plan, unless such liquidation or reorganization

4    is proposed in the Plan.

5    There are at least two important aspects of a feasibility

6    analysis. The first considers whether the Debtor will have enough

7    cash on hand on the Effective Date of the Plan to pay all the

8    claims and expenses which are entitled to be paid on such date.

9    The Plan Proponent maintains that this aspect of feasibility is

10    satisfied. Projected sales in 2010 will generate profits that

11    fund the Plan. Incoming cash during the six months from February

12    through July is projected to be $1,602,061. Outgoing payments

13    during the same period are expected to require $1,534,626 (which

14    includes monthly interest payments plus monthly principal payments

15    of $15,000 to Rabobank), leaving a balance of $67,435.

16    In order to achieve profitability, Map Link sales must

17    increase in 2010 to exceed the fixed payroll and rent costs as

18    well as the base levels of the variable expenses. Two new

19    projects are expected to contribute enough new sales to bring Map

20    Link to profitability and provide the cash for the Plan payments

21    due on the Effective Date. The first venture, which sells 3-D

22    postcards to retailers, is expected to contribute 19% of the sales

23    in the next seven months. The Earth atlas, a massive book

24    retailing for $5800 per copy, is expected to contribute 17% of the

25    sales in the same period.

26    The Plan Proponent maintains that this aspect of feasibility is

27    satisfied as illustrated here:

28

| | | |
|---|---|---:|
| 1 | Cash Debtor will have by Effective Date: | $72,808 |
| 2 | To pay: administrative claims | $50,000 |
| 3 | To pay: statutory costs and charges | $100 |
| 4 | To pay:  Secured creditor Rabobank | $15,000 |
| 5 | Balance after paying these amounts | $7,708 |

The sources of the cash Debtor will have on hand by the Effective Date, as shown above are:

| | |
|---|---|
| $5,373 | Cash in DIP Account now |
| $67,435 | Additional cash DIP will accumulate from net earnings between now and Effective Date |
| **$72,808** | **Total** |

The Debtor will have the cash on hand by the Effective Date from the accumulation from earnings between now and the Effective Date. Interest at approximately 5% is being paid to the secured creditor, Rabobank.  There is no interest due for other debt.

The second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments.

The Proponent has provided financial information which includes historical, current and projected financial information from January 2009 through June 2014.  Please refer to Exhibit B for the relevant financial statements which reflect the actual and projected financial information from September 2009 through June 2014.  *You are advised to consult with your accountant or financial advisor if you have any questions pertaining to these financial statements.*

1    In summary, the Plan proposes to pay increasing amounts to

2    creditors each year over the plan period. See Sections C.1

3    (Secured Creditor Payments), C.2 (Priority Unsecured Creditor

4    Payments) and C.3 (General Unsecured Creditor Payments) for the

5    exact proposed payment schedule.    As Debtor's financial

6    projections set forth in Exhibit B demonstrate, Map Link will have

7    an increasing cash flow after paying operating expenses over the

8    life of the Plan.    The final Plan payment to secured creditor

9    Rabobank of $350,000 is expected to be paid in June 2013 and the

10   final payment to General Unsecured Creditors is expected to be

11   paid in September 2014.    The Plan Proponent contends that Debtor's

12   financial projections are feasible.    As shown by Debtor's

13   historical, current and projected financial information, Debtor's

14   average net cash flow after paying operating expenses (but before

15   payments to Rabobank) in the first year after the filing of this

16   bankruptcy case is $30,448 per month.    Debtor's average projected

17   cash flow during the plan period, after paying operating expenses

18   (before payments to creditors) is approximately $35,000 per month.

19   Furthermore, as discussed earlier in the Disclosure Statement at

20   Section {II.E.4}, Debtor has implemented procedures to both

21   decrease recurring costs and increase revenues.

22                                   V

23                 **EFFECT OF CONFIRMATION OF PLAN**

24   A.   **Discharge**.

25   This Plan provides that, upon substantial consummation of the

26   plan and entry of the final decree (which can occur after the 1st

27   and 2nd installment payments have been paid to Class 3), the

28   Debtor shall be discharged of liability for payment of debts

1  incurred before confirmation of the Plan, to the extent specified

2  in 11 U.S.C. §1141.  However, the discharge will not discharge any

3  liability imposed by the Plan.

4      **B.   Revesting of Property in the Debtor**.

5      Except as provided in Section {V.E.}, and except as provided

6  elsewhere in the Plan, the confirmation of the Plan revests all of

7  the property of the estate in the Debtor.

8      **C.   Modification of Plan**.

9      The Proponent of the Plan may modify the Plan at any time

10 before confirmation.   However, the Court may require a new

11 Disclosure Statement and/or re-voting on the Plan.

12     **D.   Post-Confirmation Status Report**.

13     Within 120 days of the entry of the order confirming the

14 Plan, Plan Proponent shall file a status report with the Court

15 explaining what progress has been made toward consummation of the

16 confirmed Plan.   The status report shall be served on the United

17 States Trustee, the twenty largest unsecured creditors, and those

18 parties who have requested special notice.   Further status reports

19 shall be filed every 120 days and served on the same entities.

20     **E.   Post-Confirmation Conversion/Dismissal**.

21     A creditor or party in interest may bring a motion to convert

22 or dismiss the case under §1112(b), after the Plan is confirmed,

23 if there is a default in performing the Plan.   If the Court orders

24 the case converted to Chapter 7 after the Plan is confirmed, then

25 all property that had been property of the Chapter 11 estate, and

26 that has not been disbursed pursuant to the Plan, will revest in

27 the Chapter 7 estate.   The automatic stay will be reimposed upon

28

1   the revested property, but only to the extent that relief from

2   stay was not previously authorized by the Court during this case.

3   The order confirming the Plan may also be revoked under very

4   limited circumstances.   The Court may revoke the order if the

5   order of confirmation was procured by fraud and if the party in

6   interest brings an adversary proceeding to revoke confirmation

7   within 180 days after the entry of the order of confirmation.

8   **F.   Final Decree.**

9   Once the Plan has been substantially consumated, the Plan

10  Proponent, or other party as the Court shall designate in the Plan

11  Confirmation Order, shall file a motion with the Court to obtain a

12  final decree to close the case.

13

14                                    Respectfully submitted,

15      Dated: 4/28/10

16                                    By William S Hunt
17                                    Bill Hunt, president of Map
                                      Link, Debtor and Plan Proponent
18

19      Dated: 5/3/10                 BEALL & BURKHARDT

20

21                                    By:
22                                    Eric W. Burkhardt, Attorneys
                                      for Debtor, Plan Proponent
23

24

25

26

27

28

29